**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **BELIGH SRAIEB,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 21 C 4263** |
| | ) | |
| **NORTHEAST REGIONAL** | ) | |
| **COMMUTER RAILROAD CORP.,** | ) | |
| **VICTOR FLORES, ADAM FLORENCE,** | ) | |
| **and PATRICIA EMMANUEL,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

Beligh Sraieb identifies as an Arab, Muslim, and Tunisian man. Sraieb has sued
his employer, Northeast Illinois Regional Commuter Railroad Corporation—which does
business as Metra—for employment discrimination based on his religion, ethnicity, and
national origin. The defendants previously moved to dismiss several of Sraieb's claims.
On June 9, 2022, the Court dismissed counts 1, 2, 3, and 4 of Sraieb's complaint for
failure to state a claim. The following claims remain in the case: claims under Title VII
of the Civil Rights Act of 1964 for discrimination on the basis of race (count 5), religion
(count 6), and national origin (count 7) based on Sraieb's non-selection for three
different promotions for which he claims he was qualified; a Title VII claim for
maintaining a hostile work environment based on religion, race, and national origin
(count 8); and a Title VII claim for retaliation (count 9). Discovery is now complete, and
Metra has moved for summary judgment on all of Sraieb's remaining claims. For the

reasons set forth below, the Court grants Metra's motion.

**Background**

The following facts are undisputed unless otherwise noted.

**A.    Metra**

Metra operates a public commuter rail system serving a six-county region in northeast Illinois.  Sraieb began working for Metra in October 2016, first as a student locomotive engineer and, upon completion of his training, as a locomotive engineer assigned to the Chicago Union Station (CUS) District.

Metra's established policies prohibit discrimination and harassment, based on employees' protected categories, in all aspects of employment.  Metra's policies also prohibit retaliation against employees who make bona fide complaints of discrimination and/or harassment.  An employee who believes he or she was discriminated against may file an internal complaint alleging discrimination following Metra's Equal Employment Opportunity (EEO) Complaint Procedure.  It is Metra's stated policy to protect employees from retaliation for filing an EEO complaint.

**B.    Sraieb**

Sraieb was born in Tunisia, practices Islam, and identifies as Arab.  Sraieb alleges that he is the only Arab, Muslim, Tunisian locomotive engineer working in his District.  Sraieb voluntarily discusses his race, religion, and national origin with other Metra employees.  Metra collects data regarding its employees' races, as required by federal law.

Sraieb has never received a poor performance evaluation or been formally disciplined while working for Metra.  He characterizes two "verbal conferences" he

received in August 2020 as discipline, but Metra disputes that characterization, stating that verbal conferences are merely a precursor to discipline.

## C.  Breakroom incident

In January 2017, an incident occurred between Sraieb and Kevin Fowler, another Metra employee, while the two were still student locomotive engineers in training. Fowler, Sraieb, and other trainees were watching the inauguration of President Donald Trump in a breakroom.  Fowler made a series of Islamophobic comments.  Specifically, Sraieb testified that Fowler stated, "Yes, we got ourselves a real president now. Not that Allah Akbar shit."  Sraieb Dep. at 115:7-8.  Sraieb testified that he looked at Fowler and said, "What did you just say?" to which Fowler replied, "You heard what I said.  We have ourself [sic] a real Christian president, not that Allah Akbar shit."  *Id.* at 115:13-16. Sraieb told Fowler that "the word Allah is just a literal translation of the word God."  *Id.* at 115:17-18.  Fowler replied, "No, it is not. Your fucking Allah tells you to kill people." *Id.* at 115:19-20.  Sraieb told Fowler to stop because "you can get into a lot of trouble for speaking in this matter [sic]."  *Id*. at 115:22-23.  Sraieb further testified that, after this exchange, he left the room with his training engineer, Josh McCleary, who apologized to Sraieb and told him he "shouldn't have to hear that."  *Id.* at 116:4-5.

## D.  Investigation and aftermath of breakroom incident

Metra contends that management immediately investigated the incident and helped the employees resolve their differences "at the employees' request."  Defs.' LR 56.1 SOF ¶ 30.  Sraieb testified during his deposition to the following version of events. Out of fear that he would be reported, Fowler himself reported the breakroom incident to then-Manager of Regulatory Compliance, David Martinez, and Michael Kubiak, then-

supervising locomotive engineer in the training department.  The following week, Sraieb received a call about the incident from Marty Fitts, director of the training and certification program.  Fitts told Sraieb "[w]e're getting reports that you are having a hard time getting along with your co-workers."  Sraieb Dep. at 118:11-12.  Sraieb testified that he started crying and told Fitts that he was afraid of being fired because he was still a probationary trainee, had just bought a house with his wife, was new to the railroad and the territory, and still needed to "learn to get along with everybody . . . and know everybody."  *Id.* at 119:13-14.  Sraieb further testified that "[a]t that time . . . being Muslim . . . was not really a popular thing because of the political climate in the country." *Id.* at 119:15-18.  Sraieb testified that Fitts was "very supportive" and told him he was "going to have a few choice words with [] Fowler" and instructed Sraieb to speak with Fitts directly if there were further issues.  *Id.* at 119:19-22.  Sraieb further testified that he "thanked [Fitts], but by that time the incident spread out like wildfire, and [he] was already a pariah."  *Id.* at 120:1-3.

Sraieb testified that approximately three months later, in March 2017, another conductor named Boris Apostolov told him that Fowler was "going around and telling people to watch out" for Sraieb because he was "going to be nothing but a trouble maker."  *Id.* at 121:12-14.  When he got off work that day, Sraieb called Rob Tellin, Senior Trainmaster, and his union chairman "to try to basically get [Fowler] to leave [him] alone," *id.* at 121:24–122:1, which he considered a "non-formal channel."  *Id.* at 121:24.  The next day, Sraieb was called to a meeting downtown with Fowler, Tellin, and Vic Flores, then-Superintendent of the CUS District.  Sraieb testified that, during the meeting, he told Fowler that "he was going around and creating a hostile work

4

environment for [Sraieb]," *id.* at 122:7-8, and that Flores "insisted on [them] just hugging it out, shaking hands, let's just get along."  *Id.* at 122:10-11.  Sraieb further testified that Flores said, "Okay, if we are not going to hug it out, then I am going to have to take this up to the EEO."  *Id.* at 123:6-8.  Sraieb decided to "take the high road," and opted to "just hug it out."  *Id.* at 123:10-11.

**E.    David Kinkade's messages and social media posts**

In May 2019, Sraieb and David Kinkade, another Metra engineer, exchanged the following text messages:

> **Kinkade: ♥**
> **Plaintiff:** Yeah, I know black heart … stop worshiping [sic] satan u [sic] jackwagon.
> **Kinkade:** Satan has never lied to me like the rest of religions.
> **Plaintiff:** David. Ur [sic] name is holly [sic] it's the name of prophet david who endured the unbearable pain. I know it [sic] a very smart dude and all bullshit aside I respect you. So don't make me shove ur [sic] vape pen in my cats ass.
> **Kinkade:** I believe in no religion. I believe in nature, reason and Science.
> **Plaintiff:** Me to [sic] I am right there with u [sic]
> **Kinkade:** You are my friend. You are also A towel head … yet I will never insult you for that lol
> **Plaintiff:** I am a firm believer that the CIA is holding on to the secret of aliens that we are all hybrids descended from them and if they expose this all religious buckhead [sic] will lose their shit.

Defs.' LR 56.1 SOF, Ex. 4 (Text Messages) to Ex. 2 (Plaintiff Dep.).  Sraieb testified that he did not believe that the text referring to him as a "towel head" was harassing until a few months later when he saw other anti-Muslim comments made by Kinkade on social media (discussed below).  Sraieb therefore did not report Kinkade's texts when he got them, because he believed they were "banter joking even though it could be offensive to some people."  Sraieb Dep. at 150:1-2.

In late July 2019, a coworker sent Sraieb screenshots of a Facebook post made

by Kinkade.  In the post, Kinkade wrote:

> true… but this country didn't have a mosque on every other street corner
> back then either.  These fucking people hate us and want to kill us yet all
> of a sudden years later, America is a great place for them to run after
> crawling out from under their rock?  Bullshit.  Now these sons of bitches
> are complaining that they are being discriminated against by their
> American employers because they aren't given a prayer break during a
> certain time of day so they can face the West and worship their pro-rape
> prophet. Yea ok...good goin [sic] America.

Pl.'s LR 56.1 SOF, Ex. 13 at 5-6.  The parties dispute whether the post was made in
2017 (Metra's contention) or 2019 (Sraieb's contention).  The parties dispute the privacy
of the post.  Some witnesses testified that the post was visible to a public group of
which Kinkade and other Metra employees were members.  Metra maintains that the
post was on Kinkade's private page and thus not visible to Sraieb, who was not "friends"
with Kinkade on Facebook.  Sraieb did not report Kinkade's posts until approximately a
month later, which the Court discusses in more detail below.

**F.    Metra's hiring process**

When Metra's Transportation Department needs to fill a position, it submits a
requisition form to the Human Resources Department, which then posts the job with an
associated requisition number.  Each requisition lists required and preferred
qualifications for the position.  The HR Department then reviews applicants to determine
which meet the criteria for the position, and it selects those who will be interviewed.
The hiring manager then interviews candidates along with a representative from the HR
Department and another manager from the Transportation Department.  Each candidate
is asked the same set of pre-determined questions.  The interview panel then decides
who is selected and also decides on an alternate for the position.  Metra contends that
the reasons for the panel's selections are documented on a resume control form, but

6

Sraieb disputes that all the reasons—as opposed to just a "little snippet"—behind the panel's hiring decisions are documented on the form.  Flores Dep. at 20:18.  The panel's selections are typically reviewed in the HR and EEO Departments before becoming final.  The HR Department then makes an offer to the selected candidate.

## G.     Road Foreman of Engines position

In June and July 2019, Metra posted a requisition for a Road Foreman of Engines.  Five people, including Sraieb and Kinkade, applied and interviewed for the position.  The hiring committee selected Kinkade for the role and Sraieb as the alternate if Kinkade declined the offer.  The resume control form for the Road Foreman position, in the column labeled "Comments Supporting Recommended Action" and the row for Kinkade, states: "[c]andidate interviewed very well, very knowledgeable in mechanical aspects of operation of locomotive."  Defs.' LR 56.1 SOF, Ex. 12.  The same row and column for Sraieb states: "Mr. Sraieb has been selected as an alternate for the position."  *Id.*  The form lists comments for the other candidates who were neither selected for the position or as an alternate, such as: "[m]ore suitable candidate for position has been selected, candidate was not as knowledgeable on the mechanical aspects of the job as candidate selected."  *Id.*

## H.     Sraieb reports Kinkade; Kinkade gets demoted

Sraieb testified during his deposition that on August 15, 2019, the same day that Kinkade was promoted to the Road Foreman position, Sraieb called Flores and told him that he had an issue with Flores's decision to select Kinkade because he could not "tolerate having an Islamaphobe [sic] manager over [him]."  Sraieb Dep. at 182:20-21.  Sraieb further testified that, in response, Flores said, "Do what you got to do, I don't give

a shit" and then hung up. *Id.* at 183:6-7. Sraieb then made a formal complaint to the EEO Department regarding Kinkade's Facebook post. Sraieb's complaint stated that he had just been made aware that Kinkade was offered the Road Foreman promotion and would therefore be in a superior position over Sraieb, which made him fearful given Kinkade's Islamophobic comments on social media.

The next day, August 16, 2019, Metra initiated an investigation into Kinkade's posts, and EEO investigator Erick Allen interviewed Sraieb. According to Allen's interview notes, Sraieb told him that "[Kinkade] and others at Metra are white supremicists [sic] and openly disparage people of color and different faiths." Pl.'s LR 56.1 SOF, Ex. 12. On August 20, 2019, Sraieb sent a follow-up e-mail to Allen attaching screenshots of text exchanges in which Kinkade refers to Sraieb as unstable and stating, in the body of the e-mail, "[t]his is his motive [sic] Operandi of dehumanizing people of color and he has done so to other engineers that are African American and others." Pl.'s LR 56.1 SOF, Ex. 14. Sraieb further wrote:

> Mr. Allen now that's [sic] known that I am the one who turned him in and I am the whistleblower, I do know that I will face retaliation from coworkers and also managers and I do fear for my life and my family's life, I am having a hard time sleeping at night and do fear going to work. I need your help in this matter, please.

*Id.*

On September 9, 2019, Allen interviewed Kinkade. According to Allen's notes, during the interview, he showed Kinkade a number of Facebook posts containing anti-Muslim commentary, including the post that prompted the investigation. Kinkade admitted that he made the posts but "denied the language used or the topic is discriminatory, inflammatory or targeted any Metra employee." Pl.'s LR 56.1 SOF, Ex.

8

11.

On September 26, 2019, Metra rescinded Kinkade's promotion after the EEO department's investigation found Sraieb's allegations to be substantiated and concluded that Kinkade had violated Metra's EEO policy. Upper management offered Kinkade to remain at Metra as a locomotive engineer or face other consequences. Kinkade chose the former and transferred to a different district. Metra also directed Kinkade to complete sensitivity training and warned that he needed to conform professionally.

Word of Sraieb's complaint quickly spread. Sraieb himself concedes to talking with other employees about his complaint despite Allen advising him to keep the complaint confidential. Employees who learned about Sraieb's complaint expressed the belief that it was motivated by his desire to get the Road Foreman position. Many employees took sides, and those who believed that Sraieb made the complaint only to get the promotion were sympathetic to Kinkade.

On November 6, 2019, Metra offered the Road Foreman position to Sraieb. He declined the offer the next day. Sraieb testified during his deposition that he declined the offer out of fear of retaliation, as certain managers had vowed not to help him. He further testified that Metra followed up with him to encourage him to take the position, told him he could perform the job, and reminded him that if he had concerns about retaliation, he could go to the EEO Department. Sraieb still declined.

Flores testified that Allen spoke with him about Sraieb and Kinkade's working relationship, and Flores said that Sraieb would not be retaliated against. Flores further testified that he would not let Metra employees "be in that type of environment. So if there was an issue with [] Kinkade and [] Sraieb that was brought up it would be

handled accordingly."  Flores Dep. at 136:5-7.  He also testified that he had not heard of further issues between Kinkade and Sraieb after Sraieb's report.

## I.      Trainmaster position

Also in August 2019, Metra posted a job requisition for the position of Trainmaster, an employee who "supervises the train and engine crews to ensure compliance with federal regulations and the collective bargaining agreement, operating and safety rules" and "conducts formal investigations under the labor agreements . . . handles time claims, grievances, and appeals in conformance with the applicable labor agreements."  Defs.' LR 56.1 SOF ¶ 34.  The position required, among other things, a minimum five years of railroad operating experience.  The parties dispute what counts as operating experience for purposes of this requirement.  Sraieb contends that operating experience includes only conducting, engineering, dispatching, or working in an operating environment.  Metra contends that operating experience can also include experience in labor relations.  Sraieb also contends that three years of supervisory experience was required, but Metra contends that some amount of supervisory experience was only preferred, not required.

Eleven candidates were interviewed for the position, including Sraieb, who was interviewed on October 13, 2019.  Flores served on the interview panel.  Kevin Lynch and Alyssa Battaglia-Hoffman—who are white, non-Muslim, and non-Tunisian—were both selected for the position, and Sraieb was not selected as an alternate.  The resume control form for the Trainmaster position, in the column labeled "Comments Supporting Recommended Action" and the row for Lynch, states: "Mr. Lynch answered all questions showing his extensive railroad knowledge as an operating employee

10

(conductor & engineer)." Defs.' LR 56.1 SOF, Ex. 18. The same row and column for Battaglia-Hoffman states: "Alyssa answered all the questions clear and concise, she also has extensive knowledge in the operating labor agreements." *Id.* The same row and column for Sraieb states: "Interviewed well, but felt other candidates are more suited for this position." *Id.*

**J.    Senior Positive Train Control Train Operations Engineer position**

In October 2019, Metra posted a requisition for two Senior Positive Train Control (PTC) Operations Engineer positions. A Senior PTC Train Operations Engineer "coordinates and project manages the testing of [PTC] equipment on test trains to verify functionality, document results, and report observations." Defs.' LR 56.1 SOF ¶ 38. The hiring committee interviewed seven people for the role, including Sraieb. Nathaniel Russell and Edgar Jimenez were selected for the role, and Sraieb was selected as a third alternate (i.e., as the third option behind two other alternates). The resume control form for the Senior PTC Ops Engineer position, in the column labeled "Comments Supporting Recommended Action" and the row for Russell, states: "Nate answered all questions without any hesitation. Displayed confidence in his responses. Due to his currently working with PTC, will help immediately." Defs.' LR 56.1 SOF, Ex. 21. The same row and column for Jimenez states: "Edgar has some exposure to PTC and answered questions confidently. His approach to work as a team to find solutions is why he was selected." *Id.* The same row and column for Sraieb states: "Beligh was unable to identify what regulation covered PTC. Did not display confidence in responses to questions that were asked during interview. 3rd alt." *Id.*

K.    **Roster incident**

On December 18, 2019, coworkers informed Sraieb that a seniority roster posted

at the Fox Lake Depot had comments written next to his name that appeared to

reference his EEO complaint.  The comments read: "[b]e a man and say to face," and,

"[s]o you know who to call EEO on?" and included an arrow pointed at Sraieb's name.

Pl.'s LR 56.1 SOF, Ex. 23 at 5.  That same day, Sraieb sent an e-mail to Patricia

Emanuel, Metra's EEO and Diversity Director.  In his e-mail, Sraieb stated the following:

> I am reaching out to you in regards to my work conditions with Metra . . . .
> A fellow employee forwarded this picture to me of some derogatory word
> [sic] scribbled by my name at the fox lake depot.  My question is this is
> [sic] did the manager on duty witness this or knows the person behind
> this?

Pl.'s LR 56.1 SOF, Ex. 34 at 4.  Emanuel responded fifteen minutes later, telling Sraieb

that she would have Allen get in touch with him.  She also asked if Sraieb had made his

managers aware of the photo.  Sraieb replied "[n]o . . . [i]t's with a deep heavy heart that

I will admit that I lost trust in some of my managers given the situation with Kinkade and

what enfolded with it.  Some chose to side with him and not uphold their duty as

managers."  *Id.* at 3.  Emanuel replied "So noted.  Mr. Allen will be in contact with you

upon his return to the office on Monday, December 23, 2019.  I have attached the EEO

complaint form for your convenience, if you wish to file an official complaint with this

office.  You may complete and email the form to Mr. Allen."  *Id*.  On December 23,

Emanuel forwarded Sraieb's e-mail to Allen and said, "Give him a call today."  *Id.*

On January 12, 2020, Sraieb filed an internal EEO complaint regarding the Fox

Lake Depot incident.  An e-mail from Allen sent to Emanuel on Monday, February 3,

2020 states: "[Sraieb] and I spoke the week before last prior to him forwarding the

contents of his hostile environment complaint. The log should reflect that conversation. I affirm that it does." Pl.'s LR 56.1 SOF, Ex. 34 at 2. Management removed the roster and no further such incidents occurred. Sraieb contends that Metra did not investigate the incident. Metra disputes that and states that the matter was referred from the EEO department to Metra's Law Department for investigation because, by that time, Sraieb was represented by counsel.

## L. Metra takes pre-disciplinary action against Sraieb

When an employee violates Metra's attendance policy for the first time, there is a verbal conference with the employee's supervisor. A second infraction results in a letter of instruction (LOI), and it serves to notify the employee that a subsequent infraction will subject the employee to discipline.

On August 1, 2020, Sraieb was late to work. The Road Foreman gave Sraieb a verbal conference, as it was his first attendance infraction. This verbal conference was not memorialized in writing until close to two months later, on September 30, 2020. On August 11, 2020, Sraieb was again late to work. Though Metra's policy would have typically been to issue an LOI upon Sraieb's second infraction—and despite the fact that it drafted one—Metra did not issue Sraieb a LOI. Instead, he received a second verbal conference, this time from the Trainmaster.

From May 2020 to June 11, 2021, nine non-Muslim, non-Arab, and non-Tunisian employees received LOIs upon their second attendance infraction. Sraieb disputes the timing of the LOIs issued to these employees and the timing of their infractions.

## M. Fatality-related EEO complaint

On April 16, 2020, Sraieb filed a third complaint with the EEO Department

against Adam Farence, then-Senior Trainmaster and J.J. Balonek, another engineer and then-union representative. Sraieb's complaint concerned a March 2020 fatality that occurred while he was operating a Metra train and Metra's handling of the incident. Sraieb claimed that Farence and Balonek intentionally delayed giving Sraieb the results of the investigation in retaliation for his complaint against Kinkade. He also claimed that he agonized for days about whether the fatality had been ruled a suicide or whether he would be held legally responsible in some way, as Farence would not return his calls. The complaint further states that Sraieb told his friend Dave Roberts, another engineer, about the situation. It also stated that Roberts asked Balonek why he hadn't informed Sraieb that he had been cleared of any wrongdoing and that Balonek replied, "Beligh isn't well-liked and doesn't have any friends." Pl.'s LR 56.1 SOF, Ex. 40 and 6.

Within twenty minutes of receiving Sraieb's complaint, Emanuel unilaterally determined that Sraieb's complaint was not an EEO matter and instructed the EEO investigator not to respond. Instead, she forwarded Sraieb's complaint to Flores and asked him to look into it. Flores forwarded the complaint to Farence. Farence replied to all of Sraieb's allegations, and that reply was forwarded back to Emanuel. Emanuel then informed Sraieb via e-mail that she had been in contact with Flores about his complaint and that his concerns had been addressed by management.

**N.    LOI-related EEO complaint**

On October 7, 2020, Sraieb filed a fourth EEO complaint. This complaint concerned an alleged threat made by Farence to issue a LOI for an attendance infraction that had occurred sixty days prior, which Sraieb considered to be retaliation. Emanuel forwarded the complaint to Metra's Law Department, which found that Sraieb's

14

allegations were not substantiated.

**O.  Miscellaneous other incidents**

Sraieb testified during his deposition that he was the object of various other offensive and harassing actions.  For example, Sraieb testified that in June 2019, another engineer named Rob Dargan introduced Sraieb to his wife as "[his] Muslim brother from the Muslim brotherhood," which Sraieb testified is another way of calling him a terrorist.  Sraieb Dep. at 135:5-6.  Sraieb testified that he did not report the incident because Dargan was close friends with Farence and he did not want to know what would happen to him if he did report it.

Sraieb also alleges that he was administered more "operational tests" than others.  Metra's position statement to Sraieb's IDHR complaint states that:

> As a Locomotive Engineer with less than three years of experience at Metra, [Sraieb] was *subject to* additional testing.  Additionally, he is on the "Extra Board List" under his Collective Bargaining Agreement, which means he is not scheduled to work every day.  He is on call 6 days a week and may be called in to work is a scheduled locomotive engineer calls off work.  According to his manager, employees on the Extra Board are more difficult to track down for operational testing so they try to test them whenever they are available so that employees meet the annual testing requirements.

Pl.'s LR 56.1 SOF, Ex. 36 at 3 (emphasis added).  A declaration by Farence states that Sraieb was administered either the same number of operational tests as others or fewer (e.g., 137, 68, and 46 tests in 2019, 2020, and 2021, compared to 149, 94, and 64 tests administered to Kinkade in the same years).  Metra does not dispute that, as part of his training, Kinkade was present with then-Senior Trainmaster Robert Tellin for one of Sraieb's operational tests in September 2019.

Sraieb also alleges that other Metra employees would make comments about

15

him over the radio communications system and that employees aside from Kinkade posted onto Facebook and "liked" posts that were derogatory toward Islam, Muslims, and Arabs.  A declaration submitted by Charles Lough, a coworker of Sraieb's, states that he overheard other engineers ask Sraieb snide questions about the fact that he would not eat pork and that he saw a derogatory post about Muslims on a Facebook group for Metra employees.  Metra does not dispute that Roberts testified during his deposition that one manger in a different department said, in substance, that Sraieb better watch his back and that we have dirt on him.  Nor does Metra dispute that Farence testified that he "put [his] guard up" after Sraieb made a complaint against him. Farence Dep. at 164:3.

**P.      Sraieb's lawsuit**

Sraieb filed several discrimination charges with the Illinois Department of Human Rights, and on May 26, 2021, the agency issued him a right-to-sue letter.  Shortly thereafter, on August 10, 2021, Sraieb filed the present lawsuit.

## Discussion

To prevail on its motion for summary judgment, Metra must demonstrate that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party."  *Egonmwan v. Cook Cnty. Sheriff's Dep't.*, 602 F.3d 845, 849 (7th Cir. 2010) (quotation marks omitted).  For a claim of employment discrimination, then, the question the Court must ask is whether "the non-moving party produced sufficient evidence to support a jury verdict of intentional discrimination."

*David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017).

Although "the mere existence of *some* alleged factual dispute between the parties" is

insufficient to preclude summary judgment, courts should apply the standard with

special scrutiny to employment discrimination cases, which often turn on the issues of

intent and credibility. *See Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692

(7th Cir. 2000) (emphasis in original) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 247 (1986)).

## A.      Failure-to-promote claims – counts 5, 6, and 7

In counts five, six, and seven, Sraieb alleges that Metra violated Title VII by

failing to promote him to three positions for which he applied and for which he was

qualified, because of his national origin, religion, and/or race.

One method of proving employment discrimination is through the *McDonnell*

*Douglas* burden-shifting framework. *Logan v. City of Chicago*, 4 F.4th 529, 536 (7th Cir.

2021); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Under this

approach, the plaintiff must first establish a prima facie case of discrimination.

*McDonnell Douglas*, 411 U.S. at 802. If the plaintiff makes such a showing, the burden

shifts to the employer to provide a "legitimate, nondiscriminatory reason" for its actions.

*Id*. Once the employer does so, the burden shifts back to the plaintiff to present

evidence that the stated reason is a pretext for discrimination. *Id.* at 804.

Another method of proving discrimination is via the arguably simpler *Ortiz*

standard, which asks simply whether the evidence would permit a reasonable factfinder

to conclude that a "proscribed factor caused the discharge or other adverse

employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). In

*Ortiz*, the Seventh Circuit identified three broad categories of circumstantial evidence that will support an inference of intentional discrimination: "(1) ambiguous or suggestive comments or conduct; (2) better treatment of people similarly situated but for the protected characteristic; and (3) dishonest employer justifications for disparate treatment." *Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923, 929 (7th Cir. 2020). This analysis—particularly the third factor regarding pretextual justifications for disparate treatment—largely calls for the same analysis required by the *McDonnell Douglas* framework, which is delineated below. In this case, summary judgment comes out the same way irrespective of which of the two standards one applies.

### 1. *McDonell Douglas* analysis

#### a. Prima facie case

To establish a *prima facie* case of discrimination, Sraieb must show that: (1) he is a member of a protected class, (2) he was qualified for the sought after position, (3) he was rejected for the position, and (4) the position was given to an individual outside of the protected class who was less qualified. *Jackson v. City of Chicago*, 552 F.3d 619, 622 (7th Cir. 2009). Metra disputes only the fourth requirement, contending that Sraieb has not offered evidence that would permit a reasonable jury to find that Metra promoted to each contested position others[1] who were not better qualified than him.

Regarding the Road Foreman position, Metra contends that Kinkade was selected "'because he interviewed better than and was more knowledgeable in

---

[1] The parties do not appear to dispute that the candidates selected for promotions are outside of Sraieb's protected class.

mechanical aspects of the operation of a locomotive than the other candidates.'"  Pl.'s Resp. at 7 (quoting Defs.' LR 56.1 SOF ¶ 16).  Regarding the Senior PTC Train Ops Engineer position, Metra contends that

> [e]ach applicant had similar qualifications and experience levels, so interviews were important.  During his interview, [Sraieb] could not identify which federal regulation covered PTC and did not display confidence in his responses to interview questions.  The successful candidates [Russell and Jimenez] identified these federal regulations and were confident about their answers.

Defs.' Mot. for Summ. J. at 8.

Rather than offer evidence that he was, in fact, better qualified for these roles than Kinkade, Russell, or Jimenez, Sraieb contends that Metra's proffered reasons for selecting these other candidates are pretextual.  The Seventh Circuit has noted that—in the context of Title VII cases where an employee contends that the employer's stated reason for terminating him or her is pretextual—"the analysis of the legitimate expectations inquiry [may merge] with the pretext analysis."  *Smiley v. Columbia Coll. Chi.*, 714 F.3d 998, 1002 (7th Cir. 2013).  Here, Sraieb contends that the assessment of his qualifications—which is analogous to the "legitimate expectations" inquiry in termination-related cases—was skewed by bias and thus the two issues overlap.  Consequently, the Court discusses both together in the "pretext" section below.

Regarding the Trainmaster position, Metra contends that it "selected Battaglia-Hoffman . . . because she had a crucial knowledge base of the Train and Engine labor agreements" and that it "selected Lynch . . . because he had 13 years of freight railroad experience as a conductor and locomotive engineer and more experience than [Sraieb] on interpreting labor agreements."  Defs.' Mot. for Summ. J. at 7.  Sraieb contends that he was more qualified for the position because he met the minimum five years of

railroad operating experience that was required for the role, but that Battaglia-Hoffman did not. As previously noted, Metra offered evidence that Battaglia-Hoffman met that requirement via her labor relations experience, and that a Trainmaster does not need experience operating a train. But a reasonable jury could find that labor relations experience is not a proper substitute for direct experience conducting, dispatching, or engineering trains. When asked to define operating experience in laymen's terms, Flores testified:

> A. Operating experience is you were either a dispatcher maybe, conductor maybe, engineer maybe. That would -- I would look at that as operating, that you're in the operating environment.
>
> Q. And just to be clear, Ms. Battaglia didn't have experience under what you just named. She had more labor relations experience, correct?
>
> A. Her experience was labor relations.

Flores Dep. at 180:17-24. Thus, a reasonable jury could find that, in this respect, Sraieb was more qualified than Battaglia-Hoffman for the Trainmaster role.

Sraieb also contends that he had more supervisory experience and more overall experience in the transportation industry than Lynch. But the experience that Sraieb relies upon to show that he was more qualified than Lynch was not included in his application or resume and thus was not considered by the hiring committee.

In sum, there is a genuine dispute regarding whether Metra promoted someone (Battaglia-Hoffman, but not Lynch) to the Trainmaster role who was not more qualified than Sraieb. The Court therefore proceeds to consider whether Sraieb has presented evidence that would permit a reasonable jury to find that Metra's legitimate reasons for promoting Battaglia-Hoffman were pretextual. And, as noted above, the Court will also consider whether Metra's reasons for its selections for the Road Foreman and Senior

20

PTC Train Ops positions were pretextual, as the two issues overlap.

        **b.**    **Pretext**

The pretext inquiry involves determining whether the employer's reasons for its hiring decisions were "the true ground of the employer's action[s] rather than being a pretext for a decision based on some other, undisclosed ground." *Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 417 (7th Cir. 2006).

Regarding the Trainmaster position, it is undisputed that Battaglia-Hoffman had more experience with employee collective bargaining agreements than Sraieb. But Sraieb contends that Metra's reliance on Battaglia-Hoffman's labor relations experience is evidence of pretext because the job posting required only a "working knowledge" of labor agreements. Metra, by contrast, contends that "[k]nowledge and experience in interpreting labor agreements is essential for the Trainmaster to handle formal investigations, time claims, grievances, and appeals in conformance with the agreements." Defs.' Mot. for Summ. J at 7. During his deposition, Flores explained Battaglia-Hoffman's qualifications against this backdrop:

> Q. So that was going to be my next question. Is it correct that her experience was in labor relations?
>
> A. It was.
>
> Q. And not operating experience?
>
> A. No. But part of the requirements for this position is labor agreements, time slips with the agreements, hearings that involve grievance, appeals that involve a grievance. So her experience in that environment no other candidate had that interviewed for this position.

Flores Dep. at 180:7-15. In addition, the resume control form states that Battaglia-Hoffman was selected because she "answered all questions clear and concise." Defs.'

LR 56.1 SOF, Ex. 18.  The fact that the hiring committee may have placed outsized importance on one of several requirements for the Trainmaster position cannot, alone, defeat summary judgment.  This is particularly true when considered alongside the facts that Battaglia-Hoffman was the only candidate with similar labor relations experience and that the committee found that she had interviewed well.  Under the circumstances, no reasonable jury could find that Metra's proffered reasons for promoting Battaglia-Hoffman over Sraieb were pretextual.

Regarding the Road Foreman position, Sraieb contends that Metra's proffered reasons offered for promoting Kinkade over him are pretextual because:  (1) unlike other candidates, the entry related to Sraieb on the resume control form does not provide the reasons for his non-selection but instead states only that he was selected as an alternate; and (2) Farence was both on the hiring committee for the position and a reference for Kinkade.  The Court concludes that no reasonable jury could find that these facts are indicative of a pretext.  First, Sraieb concedes that the resume control form provides only a "little snippet" of the reasons behind the interview panel's decision for each candidate.  Pl.'s Resp. to Defs.' LR 56.1 SOF ¶ 15.  Flores testified that Sraieb was *not* selected because:

> [h]is mechanical wasn't as in depth in knowledge as Mr. Kinkade . . . .  The interview for Mr. Kinkade seemed a little bit more understanding of the rules, understanding of the mechanical aspects of the equipment, and [Sraieb] wasn't at the same level, but to us would have been the second choice with the other three candidates that were --- applied.

Flores Dep. at 156:22–157:6.  Second, the fact that Farence served as both a panelist and a reference for Kinkade is arguably evidence of favoritism, but it does not suggest that the stated reasons for not promoting Sraieb were a pretext for discrimination based

on race, religion, and/or national origin.

Regarding the Senior PTC Train Ops Engineer Position, Sraieb contends that Metra's proffered reasons for promoting Russell and Jimenez over him are pretextual because: (1) "many among Metra's management were aware of Kinkade's demotion and [Sraieb's] complaint"; and (2) "Martinez, who made the selection for this position, was also the first to receive Fowler's complaint about [Sraieb] in 2017, following Fowler's offensive comments about Muslims." Pl.'s Resp. at 9. Again, no reasonable jury could find that either of these facts are evidence of pretext for discrimination. Sraieb cites no cases supporting the proposition that a decision maker's simple awareness of a candidate's protected activity is evidence that would permit an inference of pretext. The hiring panel's awareness of Sraieb's complaints may be relevant on his retaliation claim, but it cannot—without more—defeat summary judgment on his discrimination claim.

In sum, under the *McDonnell Douglas* framework, Sraieb has failed to make either a *prima facie* case of discrimination, or show that Metra's proffered reasons for promoting Kinkade, Battaglia-Hoffman, Russell, and Jimenez over him were pretextual.

### 2. *Ortiz* analysis

As noted above, to survive summary judgment under the *Ortiz* framework, Sraieb must produce evidence that would permit a rational jury to conclude that Metra did not promote Sraieb because he belongs to a protected class. Some factors that the Court would have considered, if they had been offered, are "suspicious timing, ambiguous statements of animus, evidence other employees were treated differently, or evidence the employer's proffered reason for the adverse action was pretextual." *Greengrass v.*

23

*Int'l Monetary Sys., Ltd.*, 776 F.3d 481, 486 (7th Cir. 2015). But Sraieb has failed to offer any evidence, circumstantial or direct, that would permit a reasonable finding that he was not promoted because he was Tunisian, Muslim, or Arab. All he offers is evidence that some people on the hiring committee may have had knowledge of some of his membership in protected classes,[2] which without more is not enough to permit a finding that this knowledge played any role in these individuals' decision making. And as just discussed, Sraieb also has not offered evidence that would permit a reasonable jury to find that he was treated less favorably in the hiring process than similarly situated employees outside his classes or that Metra's proffered reasons for its selections were pretextual, contrived, or inconsistent.

Accordingly, Metra is entitled to summary judgment on Sraieb's Title VII discrimination claims (counts five, six, and seven).

**B.      Hostile work environment claim – count 8**

In count eight, Sraieb alleges that Metra violated Title VII by subjecting him to hostile work environment because of his race, religion, and/or national origin. A hostile work environment is one that is "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 463 (7th Cir. 2002) (internal citations omitted). To determine whether a particular work environment meets these standards for hostility, courts consider a number of factors, including "frequency

---

[2] Sraieb asserts that the hiring panel knew he was Tunisian because Tunis, Tunisia was listed on his application as the location where he attended high school. He also asserts that the panelists knew his race because Metra is required to collect data regarding its employees' races.

of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998).

Metra first contends that Sraieb has not provided evidence from which a reasonable jury could find that his work environment was both subjectively and objectively offensive or that the harassment was severe and pervasive. In doing so, Metra reduces Sraieb's allegations to the two incidents that it concedes it had knowledge of: the 2017 breakroom incident and Kinkade's Facebook post that was the subject of Sraieb's August 2019 complaint. But as outlined above in the background section of this opinion, Sraieb has offered evidence about numerous other instances of harassment. Sraieb alleges, among other things, denials of promotion and multiple offensive, social media posts, and text messages about his race and religion. Metra does not address these points. It is likely—though the Court need not decide definitively—that Sraieb's evidence on the hostile environment point is sufficient to pose a legitimate jury question.

Sraieb has not, however, produced evidence from which a reasonable jury could find that Metra was negligent in its response to Sraieb's complaints of a hostile work environment. *Paschall v. Tube Processing Corp.*, 28 F.4th 805, 813 (7th Cir. 2022) ("An employer's legal duty in co-employee harassment cases will be discharged if it takes reasonable steps to discover and rectify acts of [] harassment of its employees.") (internal quotation marks omitted). In this case, the question of whether Metra "took prompt and effective remedial action is dispositive." *Id.* at 813.

25

The evidence shows that Metra promptly and effectively investigated the two alleged instances of harassment of which it had knowledge. Regarding the breakroom incident with Fowler, upper management was immediately made aware of what occurred and convened a meeting between the relevant parties. Sraieb said that Fitts was very supportive. At that meeting, Sraieb elected to "take the high road" and resolve his differences with Fowler there rather than proceed with an EEO complaint. Sraieb Dep. at 123:10-11. Regarding Kinkade's Facebook post, Sraieb's EEO complaint was immediately investigated, interviews were conducted, and discipline was meted out, all within about a month of Sraieb's complaint. Metra rescinded Kinkade's promotion, made him undergo sensitivity training, and transferred him to another district away from Sraieb. Sraieb does not allege any further incidents of harassment from either Fowler or Kinkade after Metra became involved.

Nor can Metra be considered to have been aware of the other instances of harassment that Sraieb alleges. Sraieb did not report them, and no reasonable jury could find that they were pervasive enough to be obvious to Metra such that it could be considered to have constructive knowledge. Moreover, the fact that Sraieb voluntarily made four separate EEO complaints in the span of a few years defeats any inference that he was too fearful to report these other complaints of harassment.

Metra took prompt and corrective action regarding Sraieb's complaints of national origin, race, and religion-based harassment of which it was aware. No reasonable jury could find otherwise. For this reason, Metra is entitled to summary judgment on count eight.

**C.     Retaliation claim – count 9**

In count nine, Sraieb alleges that Metra violated Title VII by retaliating against him for reporting Kinkade's derogatory Facebook post.  To establish a claim for retaliation, Sraieb must demonstrate that (1) he engaged in statutorily protected activity; (2) Metra took a materially adverse action against him; and (3) the protected activity and the adverse action are causally connected.  *Eaton v. J. H. Findorff & Son*, *Inc.*, 1 F.4th 508, 511 (7th Cir. 2021).  Metra contends that Sraieb has not offered evidence that would permit a finding that Metra took any adverse employment action against him or that, if it did, it was causally connected to his August 2019 complaint against Kinkade.

Sraieb contends that being passed over for promotions constitutes a materially adverse employment action.  Metra does not dispute that, legally, non-promotion counts as an adverse employment action under Title VII.  Instead, Metra raises in its reply brief—for the first time—an exhaustion argument.  But it is well-established that arguments raised for the first time in a reply are forfeited.  *White v. United States*, 8 F.4th 547, 552 (7th Cir. 2021).

Regarding causation, Sraieb contends that the fact that his non-promotion for the Trainmaster position followed on the heels of his complaint could allow a reasonable jury to find that he was not selected in retaliation for making the complaint.  It is true that Sraieb was passed up for the Trainmaster position a little over a month after he made his complaint about Kinkade, and just two weeks or so after Kinkade was demoted and Sraieb was offered the Road Foreman position instead.  *Sweeney v. West*, 149 F.3d 550, 557 (7th Cir. 1998) (stating that the nexus requirement is met when "the employer's adverse action follows fairly soon after the employee's protected

expression").  But "temporal proximity alone is rarely sufficient to establish causation."

*Castro v. DeVry Univ., Inc*., 786 F.3d 559, 565 (7th Cir. 2015) (internal quotation marks

omitted).  And in this situation, no reasonable jury could find that Metra "would not have

taken the adverse ... action *but for* [Sraieb's] protected activity."  *King v. Preferred*

*Technical Grp*., 166 F.3d 887, 892 (7th Cir.1999) (emphasis added).  As outlined above,

Metra had legitimate reasons for selecting Battaglia-Hoffman and Lynch over Sraieb,

and there is no genuine dispute regarding whether those justifications were pretextual.

Sraieb also contends that the harassment to which he was subjected after his

protected activity rises to the level of an adverse employment action.  But as conceded

by Sraieb, such harassment can only "rise to this level if severe enough to cause a

significant change in a plaintiff's employment status."  Pl.'s Resp. at 14 (citing *Knox v.*

*Indiana*, 93 F.3d 1327 (7th Cir. 1996)).  The roster incident at the Fox Lake Depot, the

taunting that allegedly occurred over the radio transmitter, and the delay in clearing

Sraieb of wrongdoing following the suicide incident did not change effect a material

change in Sraieb's employment status.  Moreover, Sraieb's allegations about being

administered more tests and audits than other employees—or being disciplined more

harshly for attendance violations—is undermined by the record, as noted above.  Thus,

Sraieb's other allegations of retaliatory harassment do not amount to adverse

employment actions under Title VII and the Court need not address the question of

causation.

In sum, Sraieb has not offered evidence that would permit a reasonable jury to

find that either his non-promotions or the various instances of antagonism to he was

subjected to post-complaint were retaliatory within the meaning of Title VII.  Metra is

therefore entitled to summary judgment on count 9.

## Conclusion

For the foregoing reasons, the Court grants Metra's motion for summary

judgment [dkt. no. 48] and directs the Clerk to enter judgment in favor of the defendants

and against the plaintiff.[3]


Date:  June 7, 2023

_____
MATTHEW F. KENNELLY
United States District Judge

_____

[3] Sraieb also asserts a challenge to the admissibility of Metra's Exhibit 27.  Given the
Court's ruling on Metra's motion, this request is moot.